These appeals come to us from judgments on jury verdicts in favor of plaintiffs, a real estate saleslady and the broker holding her license, on suits to recover commissions on the sale of land. Defendants, seller and remote partial-interest buyer of the property in question, appeal the denial of their motions for judgment notwithstanding the verdict or, in the alternative, for new trial. The cases present procedural questions regarding the right of defendants to appeal from the denials of their post-trial motions, as well as questions relating to the law of "procuring cause" in real estate sales. After careful consideration of the law and the facts, we reverse.
 I. Facts
A. The Negotiations
William C. Perdue (hereinafter Perdue) and his sister Ann Perdue Ballard inherited a sizable tract of beach-front property in Gulf Shores, Alabama. In April of 1972, Ora Gates (hereinafter Gates), a licensed real estate saleslady (Gates did business as a saleslady under the supervision of Estes Wilson Corporation, also a plaintiff, but not an active party) heard that Perdue and his sister might be interested in selling the property. Gates telephoned Perdue and told him she knew someone who might be interested in buying it. Perdue told her that he was interested in selling and that she could speak to her prospective buyer. Gates then contacted Richard A. Boykin, Sr., (hereinafter Boykin) who told her that he was interested and asked her to secure more information. The two men agreed to pay her $25,000.00 each should a sale go through. The exact nature of this agreement is in dispute, but it was certainly not an exclusive listing. Gates testified at trial that Perdue and Boykin agreed to pay the commission "when Boykin purchased the property." She asserted that Boykin told her from the outset that he would have associates with him.
Perdue and Boykin began negotiations and went to the property to inspect it. There was evidence that Richard A. Boykin, Jr., (hereinafter Boykin, Jr.), Boykin's son, went out to the property and was otherwise involved in the negotiations on his father's behalf at this stage. Perdue told Gates that there was an option on the property, but he would get out of it if he ethically and legally could. He did so, apparently sometime in May 1972. Boykin, along with Boykin, Jr., and Lykes Boykin, an attorney from Washington who was a friend, but not a relative of defendant Boykin, made an offer to Perdue and Mrs. Ballard in May or June of 1972. This offer was refused. Apparently negotiations continued thereafter, but on June 26, 1972, Boykin wrote a letter "withdraw[ing] entirely our previous proposals." *Page 167 
From this point the evidence is confusing and conflicting. Because we are viewing the evidence in the light most favorable to plaintiff/appellee Gates, we will give her version of events with occasional references to denials by Boykin, Perdue and others. Gates testified that she arranged meetings between Boykin and Perdue, wrote letters to them, and generally had about thirty or forty contacts with each of them between April and September 1972.
Gates testified that Boykin told her that he was working with Jack Nicklaus's business manager and was arranging financing with some people from Ohio. Boykin denied this, saying he never talked to anybody from Ohio until later in the fall, when an Ohio man whom he had never met called him from the Holiday Inn at Gulf Shores, Alabama. Gates said she also negotiated with Perdue's brother-in-law, Mr. Ballard, while Perdue was in Europe. She testified that sometime after June 26, 1972, (the date of Boykin's letter withdrawing his offer) Boykin called her one night "and said he was at his son's apartment and there were two men there from Mississippi who had come to talk to him about the Perdue property." He asked her to reopen negotiations with Perdue, which she did. Boykin denied this.
Gates arranged a meeting between Perdue and Boykin at a motel sometime in August 1972. She testified that Boykin informed her that the meeting was very satisfactory and that he would make a new offer. Soon after that, Perdue telephoned Gates and told her that another option, to last for 60 days, had been taken on the property as of September 7, 1972. Gates related this to Boykin, and he dictated a letter to Perdue to the effect that he was still interested in the property. During the latter part of October, she called Boykin to tell him the option was about to expire and to ask him what he wanted her to do, "and he said, I want you to just sit still because this property is coming back to us." On November 8, 1972, she wrote Boykin a letter suggesting that if he made another offer he should give Perdue a check as evidence of his good faith. This letter included the statement "If you want it — I hope it comes back to you." Gates testified that in her letter she was quoting Boykin's earlier instructions to her.
Unbeknownst to Gates during this period, Perdue was also negotiating with W.A. McClung and P.L. Blake (hereinafter McClung and Blake) through another Mobile area real estate broker, James D. McCown. These negotiations had begun in late 1971. On February 11, 1972, McCown wrote to Perdue detailing an offer from McClung and Blake to purchase the property in question. These parties were also working with parties in Atlanta, including James Jones and Donald Nichols, who were directors or officers of various corporations, including Trans-Georgia Corporation and Trans-North Corporation. The latter was incorporated on January 15, 1973. McClung and Blake were the holders of two options on the Perdue property described above. On November 30, 1972, McClung and Blake exercised their option, for which they had paid $5,000.00, enclosing an earnest money deposit of $50,000.00. Testimony at trial indicated that the two exercised their option only after ensuring that the Atlanta parties would, in turn, purchase the property.
Boykin testified that he did not think about the Perdue property again after withdrawing his offer until a man named Fergus called him from Gulf Shores and asked him to discuss his ideas for development of the property. Boykin, Jr., and Lykes Boykin were apparently also at this meeting. Fergus was from Ohio, and Boykin testified that shortly after this first meeting, he went to Ohio to join Fergus and some others in a partnership called Gulf Shores Properties. Boykin could not produce a copy of the partnership agreement, nor did he remember the date of the agreement. Boykin, his son, and Lykes Boykin each bought an 11 1/9% interest in Gulf Shores Properties for $30,000.00. In a letter dated December 27, 1972, John Kessler (a partner in Gulf Shores Properties), sent Boykin, Jr., "a first draft of the contract pertaining to the Perdue property," with *Page 168 
Trans-North Corporation listed as seller and Kessler, John and Robert Fergus, and Boykin Sr. and Jr. named as buyers. James P. Jones was listed as the person to receive communications concerning the contract for seller and Kessler to receive communications concerning the contract for buyer. Jones's address was given as 100 East Broad Street, and Kessler's, as 88 East Broad Street, both in Columbus, Ohio. Defendants objected to the introduction of this contract draft, but apparently it was admitted along with its cover letter. This James Jones is the same one listed with an Atlanta address in the Trans-North articles of incorporation.
On January 19, 1973, Samuel M. McMillan, a Mobile attorney, wrote a letter to John F. Rogers, the Ballards' son-in-law and their attorney. (The Ballards were co-owners of the property in question.) One of the statements in the letter included the following: "As you know, it is the present intention that the property will be transferred to it immediately after McClung and Blake purchase it. Mr. James Jones, attorney for Trans-North Corporation, told me that he would deliver a corporate resolution to you."
B. The Sales
On the morning of January 25, 1973, Perdue and Mrs. Ballard and their spouses executed a warranty deed conveying the property to McClung and Blake for $4,000,000.00. That afternoon McClung and Blake conveyed the entire property, approximately 1800 acres, for approximately $5,000,000.00 to Trans-North Corporation.
On January 29, 1973, Trans-North Corporation conveyed part of the property, approximately 1300 acres, to Gulf Shores Holding Co., for approximately $3,600,000.00.
 II. Procedural Threshold
Defendants raise contentions on appeal that amount to challenges to the sufficiency of the evidence. One further ground raised was the allegedly improper closing arguments by plaintiffs' counsel. However, this matter was not sufficiently preserved in the record for us to consider it.
Defendants moved for summary judgment and for directed verdicts at the close of plaintiffs' cases. The motions were denied. After verdicts for plaintiffs, defendants moved for judgment notwithstanding the verdicts (JNOV) and, in the alternative, for new trials. These motions remained pending for 90 days and were denied perforce by Rule 59.1, Alabama Rules of Civil Procedure (A.R.C.P.).
To test the sufficiency of the evidence on appeal, a party must have moved at trial for JNOV under Rule 50 (b), A.R.C.P.Great Atlantic and Pacific Tea Company v. Sealy, 374 So.2d 877
(Ala. 1979). A motion for directed verdict is a prerequisite for a motion for a JNOV. Id.
Here, defendants moved for directed verdicts at the close of plaintiffs' cases, but not "at the close of all the evidence." Rule 50 (b). Defendants did, however, submit the following written jury instruction to the trial court: "The Court charges the jury that you must find for the Defendant." Under prior practice, such an instruction was known as an affirmative charge. Williams v. First Farmer Merchants National Bank ofTroy, 237 Ala. 132, 185 So. 737 (1938). This Court has noted that "a request for an affirmative charge is the substantial equivalent of a motion for directed verdict." Pruitt v. Pruitt,343 So.2d 495, at 500 (Ala. 1976). Defendants point out that the Fifth Circuit Court of Appeals, in construing the Federal Rule 50 (b), has held that a request for an affirmative charge satisfies the requirement for a directed verdict motion. JackCole Company v. Hudson, 409 F.2d 188 (5th Cir. 1968).
In Jack Cole, supra, the court considered defendants' appeal of a denial of their motion for JNOV, despite plaintiff's contention that defendants failed to lay the predicate for the motion by moving for a directed verdict at the close of all the evidence. The Fifth Circuit noted that defendants had made and argued a motion for directed verdict at the close of plaintiff's evidence and had requested that the jury be instructed *Page 169 
to find for them. The court considered the merits of the denial of the motion for JNOV after holding that:
 There can be no doubt that the trial judge was well aware of the reasons for the requested jury instruction, and, under the circumstances, we hold that this constitutes a sufficient predicate for the subsequent motion for judgment notwithstanding the verdict. Roberts v. Pierce, 398 F.2d 954, 956 (5th Cir. 1968).
Jack Cole, at 191.
In the cases at bar, defendants Boykin and Perdue moved for summary judgments on the ground that "the undisputed facts show that the plaintiffs herein have no cause of action." The motion was denied. At the close of plaintiffs' cases, defendants orally moved for directed verdicts, and the parties argued the motions. The court denied the motions, stating that "there is a glimmer of a scintilla, which under the law requires the Court to leave the case before the jury." (Defendants argue here that "a glimmer of a scintilla" is arguably less than a glimmer or a scintilla, the proper standard. We pretermit discussion of this alleged error because we reverse on other grounds.)
When defendants submitted the affirmative charge set out above, they gave no grounds therefor and did not object to the trial court's failure to give the charge. If they were appealing the refusal to give this charge, we would hold against them under Rule 51, A.R.C.P. In this posture the equivalence of a request for the affirmative charge to a motion for directed verdict is somewhat dubious, especially in light of Rule 50 (a)'s requirement that "a motion for directed verdict shall state the specific grounds therefor." The Fifth Circuit has observed that "The rule [that a motion for directed verdict at the close of all the evidence is a prerequisite for a motion for JNOV] is a strict one, however, and we and other courts have taken a liberal view of what constitutes a motion for directed verdict for these purposes." Quinn v. SouthwestWood Products, 597 F.2d 1018, at 1025 (5th Cir. 1979) (footnote omitted). Because defendants had repeatedly made their arguments against the sufficiency of plaintiffs' evidence, we choose to follow the rationale of Jack Cole, supra, and conclude that this case is in an appropriate posture for consideration of the denial of defendants' motions for JNOV.
A further peculiarity arises here, in that defendants' motion was denied not by affirmative act of the trial judge, but by operation of Rule 59.1, A.R.C.P., which provides that a post-trial motion pending for more than 90 days is deemed to be denied. The parties here argue whether such a denial of a JNOV and new trial carries the usual effect of strengthening the presumption in favor of a jury verdict. See, e.g., Walker v.Cardwell, 348 So.2d 1049 (Ala. 1977). If such is not the case, the purpose of Rule 59.1 will be undercut, in that denial of post-trial motions by operation of law will probably receive less respect than other final judgments. On the other hand, the rationale for strengthening the presumption of correctness is that the trial judge, who has observed the proceedings, issues an order that the jury verdict is indeed not contrary to the great weight of the evidence and the law; we have no such affirmative statement here.
Both Perdue and Boykin filed on December 17, 1979, motions for JNOV, or, in the alternative for new trial. On March 13, 1980, they filed motions for special setting on the motions for new trial. These later motions noted that the 90-day period prescribed by Rule 59.1 was about to expire. The motions recited that the JNOV/new trial motion had been argued on Thursday, February 28, that the judge had been out of town the following day, and that he had been out of the office due to illness for the week of March 3. The motion further notes that the court reporter told counsel for defendant that the judge had denied the motion on Thursday, February 28, 1977, but that there was neither a minute entry nor a written note by the judge of such an order.
Under the circumstances, we feel compelled to give great deference to the jury verdict and to the evidence in plaintiff's *Page 170 
favor. Nevertheless, "Evidence which affords nothing more than mere speculation, conjecture, or guess is wholly insufficient to warrant the submission of a case to the jury." Headrick v.United Insurance Company of America, 279 Ala. 82, 181 So.2d 896
(1966).
 III. Analysis
A. The Law
Plaintiffs proceeded below, and on appeal, on the theory that Gates was the procuring cause of the sale by Perdue and of the purchase by Gulf Shores Holding Co., and that she was, therefore, entitled to her commission. As alternative causes of action she alleged that Boykin and Perdue each owed her $25,000.00 by open account or for work and labor done, but these counts are not before this Court on appeal. The court instructed the jury on a "straw intervening purchaser" theory of recovery to the effect that if the intervening purchase was a device planned to deprive Gates of her commission, she could recover. Plaintiffs deny having proceeded on this theory, but we will consider whether it supports her verdict and judgment.
In Mellos v. Silverman, 367 So.2d 1369 (Ala. 1979), a real estate commission case which hinged upon an exclusive right to sell, this Court made a footnote reference to procuring cause (which was not necessary to Mellos):
 Procuring cause refers to a cause originating with a series of events which without break in their continuity result in procuring a purchaser ready, willing and able to buy on the owner's terms. Absent contractual provisions otherwise, the broker's activities must be the procuring cause of the sale. 12 Am.Jur.2d Brokers §§ 189, 190.
Mellos v. Silverman, at 1371.
Plaintiffs cite Foote v. Moore, 342 So.2d 906 (Ala. 1977), for a definition of procuring cause. In Foote, this Court approved a jury instruction
 that in determining whether a broker has earned a commission for procuring a purchaser, it is enough that the effort of the broker, acting upon the purchaser, [is] the efficient cause of the purchaser's offer to purchase, but the broker's efforts need not be the sole cause.
Foote, at 908.
Other Alabama cases use this language of efficient, but not necessarily sole cause, as well as noting that the question is whether the broker has produced a purchaser who is ready, willing and able to buy. There is also much authority that these are questions of fact. See, e.g., Alabama Fuel Sales Co.v. Vulcan Energy Resources Corp., 339 So.2d 1007 (Ala. 1976);Marx v. Lining, 231 Ala. 445, 165 So. 207 (1936); Bailey v.Padgett, 195 Ala. 203, 70 So. 637 (1915); Handley v. Shaffer,177 Ala. 636, 59 So. 286 (1912).
There is conflicting authority on whether a realtor is entitled to a commission for introducing a prospective buyer who brings in partners or other parties as co-purchasers. Defendants rely heavily on English v. William George RealtyCo., 55 Tex. Civ. App. 137, 117 S.W. 996 (1909), and on Marshallv. White, 245 F. Supp. 514 (W.D.N.C. 1965), both of which held brokers not entitled to commissions. We note to the contrary, however, Cumberland Savings and Trust Co. v. McGriff, 61 Fla. 159, 54 So. 265 (1911), and Hill v. Capps, 248 Miss. 601,160 So.2d 186 (1964). See 12 Am.Jur.2d Brokers § 191 (1964). In general, the cases where a commission is allowed are those where the sale takes place through the efforts of the broker in conducting negotiations between the seller and buyer, with the co-buyer coming into the transaction incidentally.
In Zetlin v. Scher, 241 Md. 590, 217 A.2d 266, at 268-9 (1966), the Maryland Court of Appeals allowed a commission on a straw party theory, holding in accordance with an earlier Maryland decision
 that there was sufficient evidence from which the trier of fact could have found that the actual purchaser was one whose name did not appear on the contract.
Such is not the state of the evidence in the case at bar.
For Gates to succeed on a straw party theory, she must show by a preponderance *Page 171 
of the evidence that McClung and Blake, Trans-North Corporation, and perhaps even Gulf Shores Properties were acting as agents of Boykin. Zetlin v. Scher, supra. Not only was there little or no evidence to this effect, but also the evidence indicated independent reasons for each party to purchase and resell.
B. Application to the Case at Bar
Gates asserts that she was in fact the procuring cause of the whole sale. When confronted with the fact that McClung and Blake were negotiating with Perdue long before she introduced Boykin to Perdue, she answers that these negotiations were unfruitful — the first option lapsed, and the second was not exercised until Trans-North agreed to purchase from McClung and Blake. She points to the connection between Jones of Trans-North and Kessler of Gulf Shores Properties (per the neighboring addresses, noted above) and apparently surmises that the decision to purchase by Trans-North was effected by the decision to purchase by Gulf Shores Properties. Finally, she asserts that the involvement of the Boykin group, both financially and as local developers, was the cause of the decision by Gulf Shores Properties to buy. Defendants argue that there was no evidence negating that all of these partiescould have bought without involvement of any of the later parties. We need not indulge in such matching of speculations.
Whether "procuring cause" is defined in terms of breaks in continuity, of efficient cause, or of a buyer ready, willing, and able to purchase, we find no evidence that Gates was the procuring cause of a sale by Perdue or of a purchase by Boykin. Even though there is evidence that she continued to try to effect a sale from Perdue to Boykin throughout the period, and even though Boykin's alleged statement that "the property is coming back to us" indicates that he expected to get an interest in the property, Gates's relation to the transaction as a whole is too attenuated for us to affirm a jury verdict that she was the procuring cause.
McCown, the other real estate salesman involved, received approximately $150,000.00 in commission for effecting the sale from Perdue and Ballard to McClung and Blake and the sale from McClung and Blake to Trans-North. Even if we were to accept Gates's causal chain theory, she did not show any connection of Boykin with Trans-North to explain why Trans-North was involved. Assuming that McClung and Blake were the "two men from Mississippi" about whom Gates testified, and assuming that Boykin, contrary to his testimony, brought in the "financing from Ohio," why did they bring in the Georgia corporation? Furthermore, even if McClung and Blake were the two men from Mississippi who allegedly met with Boykin, Sr. and Jr., the fact that they were negotiating prior to the Boykins' involvement makes the supposition that they brought Boykin into their purchase equally as probable as the supposition that Boykin brought them into his. "It cannot be said that one fact can be inferred when the existence of another inconsistent fact can be drawn with equal certainty." Griffin Lumber Co. v.Harper, 247 Ala. 616 at 621, 25 So.2d 505 (1946).
Finally, the fact that each intervening party (most of whom she had never met), gained from the transaction makes improbable Gates's contention that she was the procuring cause of the entire transaction. These successive profits also destroy the straw man theory, which cannot stand for lack of any evidence that the prior parties were Boykin's agents or that the purpose of this complicated transaction was to cut Gates out of her commission.
Plaintiff has the burden of proving her case by the preponderance of the evidence, or, expressed alternatively, her burden is to prove that the facts which she posits are more probably true than not. Ex Parte Acton, 283 Ala. 121,214 So.2d 685 (1968). "We must not allow a verdict to stand which is rested on pure speculation and conjecture." Howell v. Roueche,263 Ala. 83 at 87, 81 So.2d 297 (1955).
Plaintiff Gates has failed to meet her burden in the instances noted above and *Page 172 
throughout the entire presentation of her case. Therefore, the judgment is due to be, and is hereby, reversed and the cause is remanded to the circuit court for entry of a judgment in accordance with this opinion.
REVERSED AND REMANDED WITH DIRECTIONS.
FAULKNER, ALMON, EMBRY and BEATTY, JJ., concur.